# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

**MADISON COUNTY NURSING HOME**                    **PLAINTIFF**

**VS.**                              **CAUSE NO. 3:17-CV-422 WHB-JCB**

**THE BROUSSARD GROUP, L.L.C. AND
BROUSSARD HEALTHCARE
CONSULTING, L.L.C., PREVIOUSLY KNOWN AS
BROUSSARD & COMPANY HEALTH CARE
CONSULTANTS, L.L.C.**                    **DEFENDANTS**

### MADISON COUNTY NURSING HOME'S
### MEMORANDUM IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION TO
### EXCLUDE OPINIONS AND TESTIMONY OF DAWN K. SNYDER

### I. BACKGROUND

To prove that The Broussard Group, L.L.C. and Broussard Healthcare Consulting, L.L.C., previously known as Broussard Health Care Consultants, L.L.C. ("Broussard") committed negligent acts, professional malpractice, breach of contractual obligations and other wrongdoing by failing to perform adequate Medicare billing, Madison County Nursing Home ("MCNH") retained three experts all of whom are qualified in the health care billing industry and two of whom have extensive billing experience, including Dawn K. Snyder ("Snyder").

Ed LeBreton ("LeBreton") and Snyder's expert reports not only serve as peer validation of each other reports, but also serve as peer validation of Kimberly Bellitto's ("Bellitto") opinions expressed in her report. All together, the reports of each of MCNH's experts provide overwhelming support and demonstration of MCNH's damages to a reasonable degree of certainty. On the other hand, Broussard hired experts that have no qualifications in the relevant Medicare billing industry. Moreover, Broussard either refused or failed to accept MCNH's offers providing access to the

American HealthTech System for its experts to analyze relevant data, and they likewise did not access the medical data produced in ESI format.

Broussard seeks to have Ms. Snyder's entire testimony and expert report excluded, mainly on procedural grounds shored up by confusing, misleading and misstated alleged factual arguments. They also seek exclusion based on *Daubert* grounds. MCNH will rebut those arguments below.

Broussard, however, did not and cannot attack Snyder's credentials, qualifications, experience, and thereby resulting expertise, in actual, hands-on Medicare and related billing experience.

## II. SNYDER'S KNOWLEDGE AND EXPERIENCE

Essential to any analysis under Rule 702 of the Federal Rules of Evidence is whether the expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and if the expert is "qualified as an expert by **knowledge**, skill, **experience**, training, or education." FRE 702 (emphasis supplied). Broussard does not mention or dispute Snyder's qualifications. Her knowledge and experience in the field of Medicare billing, is essential to understand MCNH's claims and damages.

Snyder has 30 years experience in the areas related to medical and Medicare billing, namely: having served as a nursing home administrator and being a licensed nursing home administrator; an assistant nursing home administrator; serving as the chief financial officer of a large County nursing home and rehabilitation facility; acting as a consultant for a company that manages nursing facilities throughout the United States; and for the last 10 years being a vice President of the Lancaster Group responsible for the entire reimbursement section, outsource billing, and other collection in Accounts Receivable's projects that relate to medical billing. (Exhibit A Deposition of Dawn Snyder, Pg 8, Lines 4-14, Pg 9, Lines 2-16, and Pgs 9-12). Snyder also holds a Masters in Business Administration.

By comparison, neither of Broussard's experts have any hands-on or Medicare billing and claims experience. In fact, each of them admitted in their depositions that they did not even attempt to examine any claims level information or data in preparing their reports. Mr. Christopher J. Murphy ("Murphy") who ostensibly was retained to rebut Snyder's expert report, has no experience with Medicare claims or billing whatsoever. Mr. Murphy focuses his accounting practice on cost reporting, and has nothing to do with Medicare billing other than referring his clients to the billing department of his large accounting firm. (Exhibit B Murphy Deposition at Page 9, Lines 22-25; Page 117, Lines 1-5). Additionally, Murphy testified that his primary focus "involves preparing Medicare and Medicaid cost reports and helping providers, skilled nursing providers, improve their Medicare reimbursement." (Ex. B Page 9, Lines 22-25). Moreover, Murphy testified that those areas of focus are after the fact of Medicare billing. (Ex. B Page 10, Lines 5-8).

Ralph A. Litolff, Jr. ("Litolff") testified that he does not have specific knowledge about Medicare billing and the process of Medicare billing, has never been involved in preparing Medicare bills, has no specific knowledge of what's involved in preparing and submitting Medicare billing, does not perform Medicare guideline audits, did not review the Medicare billing performed for MCNH, did not perform any audit or review of the books of the Medicare billing by Broussard, did not review the billing package in order to determine what's accurate and compliant for billing, and does not have the "requisite skills" to conduct an analysis of the claims looking at the Medicare census for the residents involved. (Exhibit "C", Litolff Deposition at Page 11, Lines 6-13; Page 13, Lines 9-19; Page 53, Lines 24-25, Page 54, Lines 1-7; Page 55, Lines 12-25, Page 59, Lines 19-33; Page 60 Lines 1-21; Page 66-67, Page 133, Lines 15-23.

On the other hand, MCNH submits that Snyder and LeBreton are complementary of each other as each peer reviewed the others report and each are uniquely qualified to give expert testimony in the field of Medicare reimbursement and Medicare billing review. In this particular

case they can also provide fact testimony as "to billing procedures and the state of accounts with MCNH when The Lancaster Group, LLC ("Lancaster") took over Medicare billing for MCNH." As for an expert being uniquely qualified, this case is very much like <u>Natchez Regional Medical Center, Quorom Health Resources, LLC</u>, 879 F.Supp.2d 556, 578-79 (S.D.Miss. 2012) which provides a similar analysis regarding a motion to exclude an expert witness who had extensive experience in accounting relevant to the healthcare industry. Its expert was hired to "turn around" a community hospital, Natchez Regional Medical Center ("NRMC"), following NRMC's termination of Quorum after NRMC discovered Quorum negligently performed services, albeit its services related to the overall management of that hospital.

Similarly, MCNH hired Lancaster to turn around its Medicare billing after MCNH discovered that Broussard was failing to perform the services it undertook for MCNH.

The analysis to be undertaken in determining an expert's reliability is a flexible one and depends on the facts and circumstances of each case. Id. at 577. Under the circumstances, there is no question that Ms. Snyder is uniquely qualified.

### III. ARGUMENT

Broussard's arguments are grossly uninformed and misleading as to the standards of reliability and methodology of expert testimony when determining reasonable certainty in Mississippi, especially where it pertains to Medicare billing.

"[N]o Mississippi case prescribes (or proscribes) a particular method for determining what damages are reasonably certain." <u>Id.</u> at 579.

> In Mississippi, a party may recover for loss of future profits "as long as such profits are proved with reasonable certainty, not based on speculation or conjecture." <u>Lovett v. E.L. Garner, Inc.</u>, 511 So.2d 1346, 1353 (Miss. 1987). "This Court has stated that '**there are no guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits**.' " <u>Lane v. Lampkin</u>, 175 So.3d 1222, 1228 (Miss. 2015) (quoting <u>Lovett</u>, 511 So.2d at 1353). Further, "the degree of proof required usually

depends on the particular facts of the case." <u>Lovett</u>, 511 So.2d at 1353. This Court has been clear that:

Liability cannot be escaped on the grounds that the proof as to the amount of damages, if any, is too uncertain to justify the lower court's award.  It is well recognized that "Mississippi is equally firm in its determination that **a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused**." <u>R & S Dev., Inc. v. Wilson</u>, 534 So.2d 1008, 1012 (Miss. 1988) (quoting <u>Johnston v. Safeco Ins. Co. of Am.</u>, 727 F.2d 548, 551 (5th Cir. 1984)).

<u>Lane v. Lampkin</u>, 234 So.3d 338 (Miss. 2017) (emphasis supplied). Moreover, this Court has stated:

The Mississippi Court of Appeals case <u>Benchmark Health Care Center, Inc. v. Cain</u> provides a succinct overview of the recoverability of lost profits in Mississippi:

In Mississippi, a party may recover for loss of future profits in a breach of contract action so long as such profits are proved to a reasonable certainty and not based on mere speculation or conjecture. The rule that uncertain damages cannot be recovered applies only to the nature, not the extent, of the damages. If the nature of the damages is certain but the extent is uncertain, recovery is not prevented. In <u>Cain v. Mid-South Pump Co.</u>, the Mississippi Supreme Court addressed this rule stating: [W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence-with such certainty as the nature of the particular case may permit-lay a foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage. **The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss**. The Supreme Court further provided that when a plaintiff has suffered monetary damage and has produced the best evidence available to him, he should not be denied recovery simply because the amount of damages cannot be ascertained with the same precision as an ordinary claim for damages. 912 So. 2d 175 (Miss.App. Ct. 2005) (citations omitted)

<u>Natchez Regional Medical Center</u>, 879 F.Supp.2d at 578.


**A.    Snyder's opinions and proposed testimony as presented in her report are admissible upon applying Daubert and its progeny.**

Broussard begins its legal argument with a very misleading argument, one that recurs throughout their memorandum. Broussard would have the Court believe that Snyder's methodology in her report was to "assume" the entire universe of accounts receivable that existed at the time Broussard's relationship with MCNH was terminated, approximately $2.2 million, involved billing

malpractice by Broussard. First, Snyder's expert report, attached in full as Exhibit "D," sets out in great detail the methodology she used to get to the damage number. Ex. D, pp. 3-7 and the Attachments referenced in those pages. She only included payers based on the agreements between the parties and the actions of Broussard for which Broussard undertook the duty to collect, and all other payers were **deducted from the starting analysis number.** *Id.* at p.2 and Attachment 7.2 (the latter showing the beginning universe of receivables and the areas deducted from that universe). In preparing her report, again, Snyder only looked at those areas described at p. 2 of her report and Attachment 7.1.

In Snyder's deposition testimony, she laid out in detail the items reviewed when she was preparing her report. Ex. A, pp. 43-51. During this exchange with opposing counsel, they first addressed what was reviewed in connection with the sample claims included in Snyder's report. Ex. A, p. 43, Lines 16-25 and p. 44, Line 1. After talking about the sample claims, however, opposing counsel pivoted and asked about the starting universe of receivables again, the approximate $2.2 million. While it is true that when first asked whether she "concluded" there was some wrongdoing by Broussard with respect to the entire universe of receivables Snyder answered yes (Ex. A, p. 49, Lines 10-16), Ms. Snyder realized the confusion and immediately corrected herself:

Q. Well the sampling gives us the information for the people in the sample,
but not for all the people in the 2 million, right?

A. That's correct.

Q. Okay. And what I would like is all the backup for the conclusion that you
drew that Broussard messed up each account receivable in the 2,227,586
that were sampled?

A. **The 2 million is the total AR, if I'm not mistaken, correct?**

Q. Yes. But you said you looked at each claim that was submitted for each
claim in the 2 million.

MR. MACINNIS: Object to the form. I don't think that's what she said.

A. **No, that's not what you said.**

BY MS. BURNTHORN:

Q. Okay. I want to know if you looked at -- as I understood it from your
report --

A. Uh-huh (affirmative response).

Q. -- you looked at all these things that you itemized with respect to payment
reconciliation, DDE, remits, claims, demographics, MDS, diagnosis codes,
web portal, and census.

A. Uh-huh (affirmative response).

Q. And whatever you look at, that you looked at with respect to the sample
that you attached to your report?

A. **I looked at all those for the sampling, correct. And as well for the 912. The
2.2 is the total AR.**

Q. I understand.

A. **It's the total AR. I didn't look at that for the 2.2. I looked at that for the 900.**

*See* Ex. A, pp. 49-51. (emphasis added)

Snyder did not even examine the underlying claims for the entirety of the beginning balance

of receivables in preparing her report beyond the sample and the "912" (the amount of damages

$912,242.11, rounded, determined in Attachments 7.1 and 7.2 to her report, Ex. D.). She testified she

did so for the damage analysis in her conclusions regarding the sample set in her report and the

"912." Yet, Broussard insists upon misleadingly arguing that Snyder "assumed" malpractice for the

universe of accounts receivable. That is not true. Nowhere in Snyder's report does she use the word

"assume," and she makes no conclusions about alleged negligence or malpractice in the report

beyond the $912,242.11. As Broussard argues in all of its Memorandum filed on August 24, an

expert may not opine to matters outside of her report. Snyder made no assumptions as argued by

Broussard in Section A. at pp. 3-5.

Broussard next argues, based upon the same erroneous "assumed" presentation addressed

above, that when Snyder opines about the various categories of billing, she is basing certain categories of damages on the assumption that Broussard was responsible for billing those areas when it allegedly was not required to do so pursuant to the Billing Services Agreements and the Business Associate Agreements (collectively referred to as the "Contracts"). This is a red herring as pointed out in MCNH's Response and Memorandum in Opposition to Broussard's Motion for Summary Judgment which is to be filed later today, all of which is incorporated herein by reference. Nevertheless, in her report, Snyder opined that "[t]he Medicare coinsurance for both Part A and Part B were included (in her damage calculation) since it is customary practice for billing services that bill a primary payer (e.g., Medicare) they also bill the secondary payer (e.g., for Medicare coinsurance)." Ex. D, p. 3. As it turns out, she is correct, as admitted by Broussard's billing supervisor who supervised all billers assigned to MCNH. Karen Henderson testified that Broussard performed Medicare billing and coinsurance billing, as well as Medicaid and copay billing functions for MCNH. (Exhibit "E," Henderson Deposition transcript, Page 12, Line 25; Page 13, Lines 1-6; Page 24, Lines 5-22; Page 32, Lines 1-14).

Again at p. 6, Broussard makes the misleading argument that Snyder assumed malpractice as to the beginning universe of receivables in her analysis. In fact, Snyder testified that even outside the sample she used to come to the conclusions in her report regarding the $912,242.11 damage conclusion, she saw the "same issues over and over again." Ex. A, p. 51, Lines 15-16.

Next, Broussard extols the expertise of Litolff who was hired solely to respond to Snyder's report by arguing that Snyder's methodology doesn't satisfy accepted standards for calculation of damages as set out in the book *Recovery of Damages for Loss Profits* by Robert L. Dunn, upon whom Litolff relies and cites in his report. Having read that book gives Litolff zero expertise in Medicare or medical billing of the type in this case. *See* Litolff deposition cites, *Id.*

Broussard, however, in an apparent attempt to undermine Snyder by insulting her, says in

footnote 6 at p. 9 of their Memorandum that "Dunn is an authority with which Snyder certainly should be familiar, yet is not." First, Snyder has actually billed for medical and Medicare reimbursement for three decades. Second, Snyder has never written an expert report before. Ex. A, pp. 8 (Lines 24 and 25) and p. 9 (Line 1), which does not lessen her expertise.

There is no requirement that Snyder read Dunn. She understands from her vast experience how to analyze, access and address billing, billing issues and responsibility for collections.

In <u>Natchez v. Quorum</u>, Quorom also argued that Plaintiff's expert's methodology did not meet the threshold level of reliability required by <u>Daubert</u>. That case involves the same issue. Quorum, similar to Broussard, did not challenge whether the hospital could have suffered damages, it challenged the amount of damages suffered by arguing that the expert's lost-profits valuation was speculative and improper. Ironically, in that case, one of the experts for the defense did estimate a much lower lost-profit damage amount. <u>Id.</u> at 579. But in this case, while Broussard does not genuinely dispute there are at least some damages from the sampling, it failed to offer any expert qualified enough to provide a lower estimate of damages. Litolff testified numerous times it would be up to the trier of fact, but his opinion did not offer a lower estimate of damages, likely because he was not qualified. Mr. Litolff testified, "[t]hat would be outside the scope of what I'm doing and that should be up to the trier of fact to determine whether or not it's properly established if damages were sustained" and for a trier of fact to determine whether damages are "reasonably certain or not." Ex. C Page 87, Lines 5-18, Page 131-132; Page 64, Lines 11-25.

MCNH asserts that the damages at issue are all, or at least partly in the nature of, direct damages, "At common law, actual damages may be either 'direct' or 'consequential.'" <u>Cherokee County Cogeneration Partners, L.P. v. Dynergy Marketing and Trade</u>, 305 S.W.3d 309, 314 (Tex. App. 2009) ("Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages."). Thus, "[l]ost profits may be classified as

either direct or consequential damages, depending on their nature." <u>Cherokee</u>, 305 S.W.3d at 314. As the Cherokee Court pointed out, profits because of the non-performance of the contract itself, such as the economic benefit a party would have received had the contract been performed properly, are direct damages. As explained by the Second Circuit Court of Appeals, "[l]ost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." <u>Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.</u>, 487 F.3d 89, 109 (2d Cir. 2007) (emphasis added). Lost profits are direct damages, however, when they are the "direct and probable consequence of the breach."  In this case, Snyder's calculations are based on what MCNH would have received had Broussard not failed to perform. This, in and of itself, makes the damage calculation more reliable than any other methodology.

Under black-letter contract law, a non-breaching party may recover damages sufficient to place that party in a position it would have been in but for the breach.  <u>Wilson v. Gen. Motors Acceptance Corp.</u>, 883 So.2d 56, 66 (Miss. 2004). Ms. Snyder does not speculate on her opinions. Similar to the expert in <u>Natchez v. Quorum</u>, Snyder  is uniquely qualified because she speaks from her actual experience in taking over the work Broussard previously is alleged to have performed. She considered her overall history and knowledge of the accounts at MCNH when she inherited the billing from Broussard to form her opinions in her report. Ex. A, Page 61, Lines 10-19.  When asked

if there were any claims she has been unable to collect for MCNH, she did not recall any. (Ex. A Pg 23).

In fact, Broussard issued a subpoena to The Lancaster Group ("TLG"), the company for whom Ms. Snyder works, for the production of documents "to ascertain if Lancaster meets the standards to which its personnel seek to hold The Broussard Group."   See Subpoena and email from Matthew T. Biggers, counsel for Broussard, to Richard F. Zimmerman, local counsel for Lancaster.

Over 15,000 documents were produced by TLG in response.  Broussard's silence on that issue speaks volumes.  It is clear that Ms. Snyder's opinion on damages is not based on speculative analysis, but is based entirely on her actual knowledge and experience in taking over the work that Broussard failed to perform adequately.

**B. Snyder's opinions and testimony are admissible, and there is not a material analytical gap between her conclusions and the facts of this case.**

Once again, Broussard makes misleading arguments by intentionally ignoring the dollar value of the sampling in Snyder's expert report by representing that Snyder examined only a sampling of accounts receivable of $197,571.48 in forming her opinion. They conveniently, however, ignore portions of the report itself and her testimony that establish the found damages in the sampling are higher, thus lowering the alleged "gap." Attachment 7.8 to the Snyder report specifically finds the Medicare due from the sampling to be $197,571.48, but it also finds the copay due in the sampling as a result of the failure to collect the Medicare to be an additional $95,356.00. Ex. D, Attachment 7.8 and pp. 3-7 of the report. This was likewise addressed in Snyder's deposition when opposing counsel wished to determine the totals of the two amounts, but this was conveniently excluded from Broussard's arguments where they represent to the Court several times that the sampling of claims only amounted to less than $200,000.00. *See* Ex A, pp. 119-120. The actual total of the two amounts is $292,927.48, which constitutes 32% of the total damage calculation of $912,241.11 included in Snyder's report before she amended the amount of claimed damages to **lower** the amount. More on this below.

Moreover, Snyder included in the damage amounts sought Revenue Adjustments which were improperly made by Broussard, as explained in the report, during 2015 while they were supposedly addressing the billing concerns raised by MCNH. Ex. D, p. 5, Attachment 7.7 to the Snyder report. These amounts totaled $122,171.90, and Snyder testified that she did review all of the underlying information relating to the Revenue Adjustments that were included in her sampling. Ex. A, p. 93,

Lines 14-25. Adding that total to the previous total of sampled claims brings the actual total of claims examined and included in the direct damages amount to $415,099.38, which constitutes over 45% of the total damage calculation of $912,241.11 included in Snyder's report before she amended the number.

Prior to Snyder's deposition, she determined that her original report had an inaccuracy as she did not factor in claims denied based on medical necessity which she believed were the facility's responsibility. Ex. A, p. 138, Lines 9-25 and p. 139, Line 1. The amended Attachment 7.1 actually **reduced the amount of damages** to a new total of $904,213.51. *See Exhibit "F,"* amended Attachment 7.1 to Snyder Report and Exhibit 12 to Snyder's deposition. In reviewing claims to address the possible inaccuracy in the original damage amount, Snyder testified that she reviewed all claims outside the original sampling and, therefore, had reviewed all claims in the AHT system that would have arisen during the tenure of Broussard as MCNH's billing company. Ex. A, p. 138, Lines 9-25 and p. 139, Line 1. Other than slightly reducing the damages amount, after having reviewed all of the claims in the AHT system, Snyder testified opinions in her report about Broussard's billing capabilities did not change but were instead reinforced. Ex. D, p. 139, Lines 8-14.

Broussard relies on General Electric v. Joiner, 522 U.S. 136, 146 (1997) for its arguments that Ms. Snyder's report and opinion contain too great of an "analytical gap." The facts and circumstances in Joiner have nothing in common with the facts and circumstances before this Court involving Medicare billing.  In Joiner, the Supreme Court affirmed a District Court's ruling that there was no evidence that Joiner was exposed to toxic PCB's and that Joiner's experts failed to show a link between the exposure to PCB's and his diagnosis of small cell cancer. The question there was whether animal studies involving mice that developed cancer after highly concentrated, massive doses of PCB's were injected was comparable to an adult human whose exposure was on a much smaller scale.  Id. 522 U.S. 137.  The Supreme Court agreed that this was simply too great of

an analytical gap between the data and the opinion offered.  The facts and circumstances before this Court are far different and much more comparable to Natchez v. Quorum.

Because Broussard is only challenging that "the amount of lost profits" is not "founded on a judicially–recognized methodology," Natchez v. Quorum controls with its finding that "[t]he appropriate level of damages is an issue to be presented to the finder of fact." Id.  This Court found that Mississippi law does not require a particular method for determining what damages are reasonably certain.  Even looking outside of Mississippi law, there is scant law regarding a standard methodology in the billing industry for calculating damages.  In a New Jersey case, which was cited as "Not for Publication," it was stated that while there was no standard methodology in the [medical billing] industry for calculating damages, the expert's report (who also served as a consultant during the contractual relationship with defendant) sufficiently explained his damage calculation in light of his experience in the industry and to the extent the defendant took issue with the quality of the explanation, it would have an opportunity to explore the matter on cross-examination.  Imaging Subspecialist of North Jersey v. Advantage Healthcare Solutions, Inc., Docket No. A-4134-14T4 (New Jersey Appellate Division).  Similarly, this Court found that the proper way to challenge an alleged "analytically-naked" methodology is by challenging it with testimony from their own expert witnesses or through cross-examination.  Natchez v. Quorum at 580.

**C. The "tardily" produced documents should not lead to the exclusion of Snyder's report and testimony**

There are basically two categories of documents included in the arguments of Broussard: the first are 3 documents produced at the Snyder deposition two days before the close of discovery (there was a fourth document as well which Broussard has ignored but which will be addressed here), and the second is two sets of documents produced the next week. It is not the case that MCNH or Snyder failed to produce anything whatsoever in response to a subpoena or document production requests regarding what she relied upon to reach her opinions. In response to the subpoena and

13

discovery requests, MCNH objected to the extent any work product was sought, but also noted that the parties had stipulated previously produced documents would not need to be re-produced. After conferring with its experts, both counsel for MCNH and its experts believed in good faith everything had already been provided to Broussard.

The day before Snyder's deposition, she met with MCNH's counsel. She had with her working documents relating to MCNH. Counsel requested to review those documents. These documents, however, were created in 2016, nearly two years before Snyder agreed to be an expert witness in this matter. Out of an abundance of caution, it was determined these documents should be produced at the deposition on August 1 as possibly responsive to outstanding subpoenas. This was done during the deposition, and the documents were marked as Exhibits 13, 14 and 15 to the Snyder deposition. Those Exhibits were included in an August 24, 2018 email to the Court with a proposed Order that they be filed under seal, and they will not be re-attached here as they contain protected healthcare information. Snyder testified that she did not refer to or rely upon these documents when generating her report in January 2018.  It is undisputed that TLG replaced Broussard as MCNH's outside biller in January 2016. Snyder testified at her deposition that she did not review or rely upon these documents when preparing her report. Rather, they were created as part of her job to try and collect amounts owed MCNH. *See* Ex. A, p. 139 and p. 140, Lines 1-18.

There was a fourth document produced at the deposition as well. It was the amended Attachment 7.1 to Snyder's report, discussed above, and attached as Exhibit 12 to Snyder's deposition. Ex. F.

The second category of documents were produced the week after discovery ended.

While Ms. Snyder prepared her expert report in late December 2017 and early January 2018, she would access the medical billing data for MCNH remotely *via* the internet through MCNH's computer which uses AHT. While in AHT, Snyder would compile and extract data that was in turn

used in her report and its attachments. The source data was referenced in the report. *See* Exhibit "G," Affidavit of Dawn Snyder, para. 3. Snyder identified in her report all data and information reviewed or analyzed.    Ex. D., pp. 2-3. One of the listed items was "American HealthTech Transaction Journals (AR7100A) January 2014-December 2015."

While consulting with MCNH's counsel in preparation for the deposition of Murphy[1], Snyder recalled that during the time she was preparing her report, she had difficulty accessing AHT to view the American HealthTech Transaction Journals. Being unable to access the Journals, she contacted Mr. Jim Moseley, bookkeeper for MCNH, who was able to access the Journals directly in the AHT system, extract them as .pdf's and provide them to Snyder electronically. Snyder did not print out hard copies, and when finalizing her report she simply had forgotten that in that one category of AHT data, she had looked at electronic .pdf's and not data while in AHT. The Transaction Journals can be found in a document retention folder in the AHT system. The AHT system will automatically save some reports to a document retention folder, and one of those reports is the Transaction Journal. Ex. G, paragraphs 4 and 5.

Another item identified in Snyder's report was "Medicare Claim Status Inquiry via Fiscal Intermediary Shared System (FISS*)*" ("DDE/FISS" reports). Likewise, while consulting with MCNH's attorney in preparation for the Murphy deposition, Snyder also recalled that while preparing her report she had saved as .pdf's in electronic format certain DDE/FISS reports. These can be accessed online by any authorized Medicare provider. Snyder saved these when working on her report out of an abundance of caution in the event they were archived from the Medicare system as can occur from time to time. She did not print out hard copies of the DDE/FISS reports. Ex. G, para. 8.    Snyder informed MCNH's counsel about the existence of these .pdf's stored in electronic format and she immediately forwarded them to him. The documents were immediately produced to

---

[1] By agreement of counsel, the depositions of Murphy and Litolff were taken the week after discovery concluded.

opposing counsel as document production numbers P1599-P1941.

Snyder diligently worked on her report reviewing thousands of bits of data and information, all of which was referenced in her report. Prior to Snyder's retention as an expert witness in this matter in November 2017, Bellitto was to act as the sole expert witness for MCNH, but she could not complete a detailed analysis of accounts due to a personal, medical hardship in her family. Snyder stepped in and did a tremendous amount of work in a short period of time to complete the Snyder report by the deadline. Snyder finished her report near midnight of the due date. In her haste to finish, she inadvertently did not remember that she had these .pdf's in electronic format. Ex. G, para. 10.

The late production of this second category of documents was substantially justified and in any event was certainly harmless.

In the event this Court finds that Federal Rule of Civil Procedure 26(e)(1)(A) is applicable based on Broussard's arguments, the rule provides that a party must supplement "if a party who learns that in some **material** respect the disclosure or response is incomplete or incorrect, and if the **additional or corrective information has not otherwise been made known to the other parties during the discovery process**."  In this case, the additional materials provided at deposition and shortly thereafter were made known to Broussard during the discovery process.  MCNH merely provided .pdf versions of documents that were already disclosed and had been disclosed to Broussard at all times.  The irony of the issue raised by Broussard is that a portion of the additional material submitted by Snyder at her deposition actually reduced her original calculation of damages. It simply cannot be argued that any late production is prejudicial or caused in harm, especially in light of Broussard's refusal to review relevant data made available.   The four factors cited in Texas A & M Research Foundation v. Magna Transp., Inc. 138 F.3d 394, 402 (5th Cir. 2003) do not support Broussard's position that it was harmed.  First, Broussard does not genuinely explain the

importance except for restating the rule that states disclosure was required. The only import they have to Broussard is in its feeble attempt to find a technicality to exclude Snyder's testimony, which is certainly very important to MCNH. Broussard was not genuinely prejudiced, because having the documents would not have benefited Broussard in any way. As explained below, Broussard's own expert did not even attempt to access the AHT data and made no attempt to examine anything at a claims level.

Unbelievably, Broussard argues with respect to the production issue:

"Broussard formulated its defense in this matter based in part on the lack of any untimely production   could reward MCNH for withholding evidence in discovery until it perceives an opportune time to produce that evidence to jam its opponent." (Broussard Memorandum (Dkt. 99), page 14)

First, there is no evidence to infer or allege that MCNH or Snyder intentionally withheld anything. MCNH alone has produced over 16,000 emails and attachments, thousands more documents in .pdf electronic format and, most importantly, **the entire AHT database** in electronic format.

Snyder's company, TLG, incurred incredible expense and invested much time to produce over 15,000 pages of documents to Broussard in response to a subpoena served one month before the end of discovery, because Broussard wanted to see the ordinary course of business billing records of TLG on behalf of MCNH for the more than two years. MCNH gave its consent to TLG and its attorney to produce documents after TLG's counsel conferred with Broussard's.

But, Broussard's contention that it "formulated its defense in this matter based in part on the lack of any underlying documents to support Snyder's opinions and summaries" is troubling, particularly in light of Broussard's total failure to take the opportunity to access the AHT data provided to it. Snyder relied extensively on AHT data, but the system includes an incredible amount of data. Each of MCNH's experts identified AHT information they reviewed. *e.g.* Ex. D, p. 2, and each expert stated that they understood that data had been produced to Broussard. The data was

produced, at great expense to MCNH which had to hire outside IT consultants to extract and produce the approximately 4GB of information. As set out in Exhibit "H," the Affidavit of Sean McDermott, and Exhibit "I," the Affidavit of Michael S. MacInnis, (both of which are true and correct copies of the Affidavits included as Exhibits "C" and "D" to Dkt.104, MCNH's *Motion to Exlcude Report, Opinions, and Testimony*), MCNH worked extensively with Broussard to ensure Broussard had access to the data and in fact was led to believe the Defendants successfully gained access to the data.

After being told by Defendants' IT specialist "[i]t worked!," neither MCNH's IT consultant nor his company received any more inquiries or requests for assistance from the Defendants' representatives. Ex. H, para. 17. Additionally, MCNH's counsel offered to arrange "read only" remote access for Broussard's representatives directly into the AHT system for MCNH. Although at first Broussard thought that might be the course to take, they never seized the opportunity. Ex. I.

Broussard apparently was prepared to designate an expert in the area of Medicare billing review but failed to do so (it is undisputed that neither Murphy or Litolff have any Medicare billing expertise).   On March 15, 2018, Defendants filed their *Second Unopposed Motion to Extend Defendants' Expert Witness Designation Deadline and Other Deadlines* (Dkt. 29).   Paragraph 6 of that Motion reads as follows:

> "The Plaintiff's Medicare billing data involved covers approximately six years and is voluminous. The parties to this action have also experienced unforeseen difficulties regarding the production of that data in a format common to the healthcare billing industry. Despite their exercise of due diligence, neither Broussard nor Broussard's expert witness for Medicare billing issues was able to access that data without purchasing expensive Medicare billing software or an even more expensive SQL Server license. Broussard was therefore required to procure the services of a different Medicare billing expert on short notice. That expert will require several weeks to review Plaintiff's data in forming her opinion and drafting her report. Broussard therefore requests an extension of its expert witness designation deadline until April 19, 2018. (emphasis supplied)."

After reading paragraph 6 of the draft second motion for extension, MCNH counsel emailed Broussard counsel on March 14, 2018 asking " . . . did you decide whether or not to arrange access to the data as a 'read only' format user?   It appears your new expert has determined a way to access the data in another way if I'm reading your Motion correctly."  Opposing counsel responded, in part, "[w]e think we will have a way to access the data, but we might still need the read only access. I'll let you know."

At Paragraph 7 of Broussard's *Third Unopposed Motion to Extend Defendants' Expert Witness Designation Deadline and Other Deadlines*, Broussard pled that its expert witnesses, Christopher Murphy and Julie Bilyeu of BKD CPAs and Advisors, needed additional time. Broussard never designated Julie Bilyeu and never provided an expert report of Julie Bilyeu. According to the testimony of Murphy, Julie Bilyeu is the Managing Director of Billing Services who actually does Medical billing. *See* Ex. B at Page 111, Lines 10-17.

Murphy did not review data in the AHT system made available to Broussard and was not aware that MCNH offered Broussard read only access to AHT data.  *See* Ex. B at Page 85, Lines 6-12; Page 86, Lines 6-11. Murphy had access to the AHT data but did not access the tables, because he was not familiar with it enough to make sense of it. *Id.* at Page 111, Lines 3-9.  In fact, he didn't even attempt to open the tables.  *Id.* B at Page 85, Lines 10-15.

It appears that neither Broussard or its experts made any effort actually to access and review the data underlying Snyder's report and summaries which was clearly identified, produced and made available in two formats. They should not be rewarded now for ignoring the information provided to them by having Snyder's testimony and expert report excluded. MCNH went above and beyond in its attempts to make the ESI available in a readily accessible format.

Federal Rule of Civil Procedure Rule 26(a)(1)(B) provides:

> If the documents, electronically stored information, data compilations, and tangible things [collectively "items"] required for production are voluminous, or if

other circumstances make their production unduly burdensome or expensive, the party may describe by category and location all such items in its possession, custody or control and must provide the opposing party a reasonable opportunity to review all the items at the site they are located or maintained.

It cannot be genuinely disputed by Broussard that it did not have a reasonable opportunity to review all the items MCNH made available.

**D. Snyder's summaries are admissible, and the alleged lack of underlying documents is unfounded.**

MCNH incorporates by reference its Arguments and citations in the preceding sections of this Memorandum. As discussed previously, the AHT data has been produced in a readily accessible format and it was made available in a directly accessible format, all to no avail.

Broussard makes much ado about the AHT data having been produced in SQL format, but a simple review of the entire McDermott Affidavit renders this argument vacuous. Additionally, as shown above, Broussard represented to the Court that it was unable to access the AHT data (before later representing that its new medical billing expert needed more time to review the data) " . . . without purchasing expensive Medicare billing software or an even more expensive SQL Server license." Dkt. 29, para. 6. Interestingly, McDermott has pointed out that there is a link to Microsoft's website which grants, free of charge, fully functional copies of SQL Server for 180 day use. Ex. H, para. 11.

Broussard complains that the SQL format produced 1,403 tables. Regardless of the number of tables it yielded, Murphy had access to the AHT data but did not access the tables, because he was not familiar with it enough to make sense of it. Ex. B, at Page 111, Lines 3-9.

Their arguments with respect to this position are further rendered moot when the Court considers the direct access to AHT offered by MCNH of which Broussard never availed itself. In addition to the matters covered in that regard in the McDermott and MacInnis affidavits, the access was offered again at the Snyder deposition, and opposing counsel asked if they could "still do that,"

and the undersigned said yes, so long as acceptable parameters could be set, just has been offered all along.  No one from Broussard has yet to request the access. Ex. A, pp. 131-133.

**E. Snyder's opinion on causation is not based upon on speculation.**

MCNH has already addressed how large the report sampling is as a percentage of the total damages. Moreover, Snyder testified that she kept seeing the same things over and over again in terms of the errors, as previously cited. Additionally, Snyder has been identified as a fact witness as she has been the billing manager for MCNH's accounts for 2 ½ years. The knowledge she gained from actually working the accounts to try to collect them after taking over from Broussard strengthens her opinions and their reliability. At p. 124 of her deposition, Ex. A, she said as follows:

Q.    That's done.  Other than doing that what
did you do to arrive at the $912,242.11 figure?

A.    Based on the research that I have done to
the account since taking over the account I utilized
that information obviously to come to my conclusions
whether or not that payor should be included and
basically activities and errors that I found through
my research over time.

Snyder is not speculating, and she is certain in her opinions and the damage numbers. Ex. A, p. 124, Lines 12-19.

Snyder did not base her opinions on speculation or assumption.  Broussard misrepresents her testimony.  Snyder testified that she used Bellitto's list at the time of her expert report. (Exhibit "A" Snyder Deposition Page 32).  However, Ms. Snyder "went through the same list and confirmed the status of each claim" and "did further investigation." (Ex. A Page 32).  Snyder produced everything in connection with her expert report, including "a sampling of the aged accounts receivable, payment reconciliation, transaction journals…" everything that's listed in the report." (Ex. A Page 36).  She listed all the things she reviewed for each claim.  (Ex. A Page 43-46).  All of the items she listed were retrieved from the American HealthTech system ("AHT").  (Ex. A Page 43-46).  Data is input by MCNH into AHT.  (Ex. A Page 43-46).  Snyder testified that she reviewed all the accounts on the

January 18, 2016 aged receivable report. (Ex. A Page 48-49).  Snyder looked at all of the claims for

the sampling and all the claims for the $912,000.00 as set out in her Expert Report. (Ex. A. 50-51)

(Ex. B. Snyder Expert Report).  Snyder testified that she did not look at those claims outside Ms.

Bellitto's sample when doing her report "because it was the same issues over and over again." (Ex.

A Page 51).  Snyder had the data supporting her opinions for the accounts receivables outside of the

Bellitto sample. (Ex. A Page 51).  All of the electronic data available to Snyder was at all relevant

times available to Broussard.  See Ex. H and Ex. I.

Under the applicable standards of proof, MCNH has shown more than reasonable certainty of

the direct damages suffered by MCNH.  The total amount of damages calculated by Dawn Snyder

found to be collectable but uncollected by Broussard is $904,213.51.  (Ex. C) (Exhibit D amended

Attachment 7.1 to Snyder Report) (Ex. F Pages 138-142).   The law in Mississippi is clear that "no

Mississippi case prescribes (or proscribes) a particular method for determining what damages are

reasonably certain."   Natchez Regional Medical Center, Quorom Health Resources, LLC, 879

F.Supp.2d 556, 578-79 (S.D.Miss. 2012).   However, the damage assessment calculation by Ms.

Snyder is more than just reasonable, it is or is as close to being a mathematical certainty as possible,

especially in the field of Medicare billing.

WHEREFORE, PREMISES CONSIDERED, Madison County Nursing Home requests that

this Court deny The Broussard Group, L.L.C. and Broussard Healthcare Consulting, L.L.C.

previously known as Broussard & Company Health Care Consultants, L.L.C. motion to exclude the

opinions and testimony of Dawn K. Snyder and grant such other relief as is necessary under the

circumstances.

DATED:  September 7, 2018.

**MADISON COUNTY NURSING HOME**


By: ____/s/ *Michael S. MacInnis*____
         Michael S. MacInnis
         Its Attorney


Prepared by:
Michael S. MacInnis, MSB # 8376
Jon J. Mims, MSB # 100341
Rawlings & MacInnis, P.A.
Post Office Box 1789
Madison, MS 39130-1789
Telephone: (601) 898-1180
Facsimile: (601) 969-1041
mike@rawlingsmacinnis.net
jon@rawlingmacinnis.net

## CERTIFICATE OF SERVICE

I, Michael S. MacInnis, do hereby certify that I have this day electronically filed the foregoing with the Court using the ECF system which sent notice of the filing to attorneys of record, including:

Matthew T. Biggers
mbiggers@deutschkerrigan.com
Attorney for Defendants

Judy L. Burnthorn
jburnthorn@deutschkerrigan.com
Attorney for Defendants

Lawrence M. Quinlivan
mquinlivan@deutschkerrigan.com
Attorney for Defendants

This the 7th day of September, 2018.

/s/ Michael S. MacInnis
Michael S. MacInnis