**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

**CONSULTING, L.L.C., PREVIOUSLY KNOWN AS**
**MADISON COUNTY NURSING HOME**                                    **PLAINTIFF**

**VS.**                                                    **CAUSE NO. 3:17-CV-422**

**THE BROUSSARD GROUP, L.L.C. AND**
**BROUSSARD HEALTHCARE**
**BROUSSARD & COMPANY HEALTH CARE**
**CONSULTANTS, L.L.C.**                                        **DEFENDANTS**

**MADISON COUNTY NURSING HOME'S**
**MEMORANDUM IN SUPPORT OF RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. BACKGROUND**

This case is about the negligent acts, professional malpractice, breach of contractual obligations and other wrongdoing committed by The Broussard Group, L.L.C. and Broussard Healthcare Consulting, L.L.C., previously known as Broussard Health Care Consultants, L.L.C. ("Broussard") in failing to perform adequate Medicare billing for Madison County Nursing Home ("MCNH") which caused MCNH to incur significant monetary losses. To prove its case, MCNH retained three experts all of whom are qualified in the health care billing industry and two of whom have extensive billing experience, unlike either of Broussard's experts.

Instead of focusing first on the merits, Broussard has for the first time in this matter raised a new "surprise" affirmative defense referred to as the "minutes rule." Broussard uses this defense to assert it is essentially immune from any wrongdoing because a political subdivision can only speak through its minutes. However, MCNH submits that the minutes rule is not available to be raised as an affirmative defense by a private party against a political subdivision. Even if the defense is available to a private

1

entity, non-citizen of the State of Mississippi, MCNH had board approval at all relevant times from the MCNH Board of Trustees ("Board") to be in a contractual relationship with Broussard.    Nonetheless, Broussard is attempting to use the minutes rule affirmatively as a sword against the interests of the Mississippi public in a situation where its actions have caused harm to the public. MCNH respectfully submits that the use of the minutes rule as an affirmative defense by a private party to avoid liability altogether is an unfounded interpretation of the long-standing Mississippi public policy purpose behind the minutes rule, which was to protect the public from unauthorized acts, not to shield private parties from liability.

Finally, even if the defense is available to a private, non-citizen entity, Broussard has waived the defense by failing to raise it until the filing of its Motion for Summary Judgment and is precluded from raising the defense based on the admissions in its Answer & Affirmative Defenses (Dkt. 2).

## II. STATEMENT OF DISPUTED FACTS

### A.  Broussard has waived the Minutes Rule

Broussard has waived the minutes rule by failing to raise it as an affirmative defense until now.  Not only did Broussard waive the minutes rule, it expressly admitted that it was in a contractual relationship with MCNH until January of 2016.  At Paragraphs 4, 5 and 9 of its Answer & Affirmative Defenses, Broussard "admit[ted] they entered into a contractual relationship with Plaintiff," "admit[ted] they performed services pursuant to their contractual relationship with" MCNH and admitted "that they terminated their contractual relationship with Plaintiff in January of 2016" (Dkt. 2).

B.  The Agreement was not and could not be terminated for failure to review

The Agreement was terminated by mutual consent of the parties.  (Ex. B, Logan Deposition Transcript, Page 113) (Exhibit R, January 21, 2016 Mutual Termination Letter).  This establishes the absurdity of Broussard's arguments that the Agreement was terminated in 2011. Broussard, nonetheless, submits it is undisputed that the Agreement expired on May 1, 2011 because there was no "review" of the 2010 Agreement.  To the contrary, any alleged annual review, based on separate and conflicting terms of the Agreement, could not prevent the Agreement from continuing from year to year.   At Paragraph VI titled "Termination," the Agreement provides:

> This Agreement and the employment of The Broussard Group by Administrator **shall only be terminated upon the following occurrences**:
>     (a)    Expiration of the term in accordance with the provisions hereof;
>     (b)    Permanent cessation of all business operations at the nursing facility, upon not less than sixty (60) days written notice;
>     (c)    Permanent cessation of business by The Broussard Group, upon not less than sixty (60) days written notice;
>     (d)    Failure to correct a breach of any obligation contained in this Agreement within thirty (30) days following written notification of breach by the non-defaulting party at the election of the non-defaulting party;
>     (e)    The filing of Proceedings by or against either party to this Agreement under the provisions of the Bankruptcy Laws of the United States of America or the State of Louisiana
>     (f)    Delivery by either party of not less than sixty (60) days written notice of an election to terminate the Agreement on a specified date.

C.  Broussard prepared the Billing Services Agreement(s).

It is not disputed that Broussard prepared the Agreements.  (Ex. A).

D.  The Board approved the contractual relationship at all times

Broussard made its pitch before the Board, the Board approved the contract with Broussard, and the contract was spread on the minutes. (Ex. B Logan Dep. Page 27, Lines

14-18 and Ex. A, Paragraph 8 and Attachment 1 thereto). Moreover, the Board specifically approved payments made to Broussard numerous times throughout the contractual relationship. (Ex. A, Paragraph 6) There were at least 60 monthly meetings over the course of the relationship with Broussard while Broussard provided billing services. (Ex. A, Paragraph 7). The Board approved payments to Broussard that were spread across the minutes spanning over approximately six (6) years. The 2011 Billing Services Agreement ("Agreement" or "contract") and the year to year continuing contractual relationship of the parties was at all times approved until the Board voted to terminate the relationship due to Broussard's poor performance. (Ex. A, Paragraph 6).

E.    The evidence supports that Broussard is liable to MCNH for damages

As to the merits and genuine issues of material fact regarding Broussard's negligence and breach of contractual obligations, MCNH incorporates by reference and adopts as if fully restated herein each of those facts and arguments set out in its Motion for Summary Judgment (Dkt. 106) and its Memorandum of Authorities in Support of Motion for Summary Judgment (Dkt. 107). There are issues which Broussard presents as undisputed facts that allegedly destroy MCNH's claims including: that MCNH provided incorrect Quality Hospital Stay ("QHS") information; that Broussard had no obligation to attempt to collect receivables aged over 60 or 90 days; that Broussard "turned over" receivables aged over 60 to 90 days to MCNH; that it was acceptable for Brossard to make a code 996 "Revenue Adjustment" on outstanding receivables without MCNH's consent (or even that MCNH somehow gave such consent); and that MCNH didn't provide the necessary information Broussard needed to bill. To the contrary, however, there is ample evidence to establish facts contrary to these assertions, and at a minimum

there is ample evidence to establish to they are disputed, most of which evidence derives from Broussard's own employees who worked with MCNH.  The following are just some examples:

Dawn Snyder ("Snyder") opined that Broussard is liable in an amount of no less than $904,213.51, not including other damages alleged by MCNH.  (Exhibit C Snyder Expert Report) (Exhibit D amended Attachment 7.1 to Snyder Report, used also as Exhibit 12 in the Snyder deposition).  Snyder is identified as an expert witness in the field of Medicare billing review but also may give fact testimony as "to billing procedures and the state of accounts with MCNH when The Lancaster Group, LLC ("TLG") took over Medicare billing for MCNH." (Exhibit E Response to Interrogatory No. 3). (Exhibit F Snyder Deposition; Exhibit C Snyder Report). When asked if there were any claims she has been unable to collect for MCNH, she did not recall any. (Ex. F, Pg. 23).  In fact, Broussard issued a subpoena to Lancaster for the production of documents "to ascertain if Lancaster meets the standards to which its personnel seek to hold The Broussard Group."   See Subpoena and email from Matthew T. Biggers, counsel for Broussard, to Richard F. Zimmerman, local counsel for TLG. (Dkt. 58); (Exhibit S email from Biggers to Zimmerman).  Over 15,000 documents were produced by The Lancaster Group. Broussard's silence on that issue speaks volumes.  Snyder concluded in her report that: "in summary, here we have a situation whereby a professional services firm agrees to provide billing services to the Plaintiff, bills and gets paid for those services, but does not complete the stated services in their billing agreement. Successful Medicare and other third party billing requires extreme attention to detail and follow-up. The lack of simply submitting claims timely and accurately have caused financial hardship to the Plaintiff for

uncollected Accounts Receivable that otherwise would have been collected. MCNH also incorporates by reference all citations to factual and damage conclusions set out in MCNH's *Memorandum in Support of its Response in Opposition to Motion to Exclude Opinions of Dawn K. Snyder* (Dkt. 115).

- Ed LeBreton ("LeBreton") opined that Broussard was negligent in performing its obligations to MCNH.  (Exhibit G LeBreton Report).

- Daniel Logan ("Logan"), MCNH's Administrator, testified he understood from the beginning that Broussard was to perform all Medicare related billing, including coinsurance and self-pay if the primary payor was Medicare. (Ex. B Pages 35-37). He knew nothing about Medicare related billing and depended upon Broussard to handle all Medicare related billing.  (Ex. B Page 25, Lines 5-25).  Mr. Logan understood Broussard would take care of older accounts, past 90 days, based on Broussard's statements.  (Ex. B Page 41, Lines 7-23; Page 42, Lines 7-14. He testified that its responsibility was to pay Broussard to do the Medicare billing but a Medicare nurse at MCNH would gather the information for billing.  (Ex. B Page 45, Lines 6-24).

- At the 30(b)(6) deposition of MCNH, Logan testified that the claim for punitive damages is based on the fact that Revenue Adjustments on the accounts receivables made it appear claims were being collected when in fact they were merely adjustments made for amounts that could have been collected by Broussard but were made to go away. (Exhibit I MCNH 30(B)(6) Deposition Page 16, Lines 9-19).

- As to the adjustments in the system, Logan testified that MCNH did not do Medicare billing and any adjustments would have been made by Broussard. The adjustments made it appear that accounts were collected but they were not. (Ex. B Page 95, Lines 18-25;

Page 96, Line 1; Page 114, Lines 3-25; Page 115, Lines 1-25 and Page 116, Lines 1-3).

Broussard would come on site to train Medicare nurses. (Ex. B Pg. 50, Lines 17-24), yet

in their lawsuit Broussard complained about MCNH's Medicare nurses. To the contrary,

Broussard's employees testified they had no problems with MCNH's current Medicare

nurse of 5 years and only one issue they recalled with a nurse who only worked for

MCNH for a relatively brief period of time. (Ex. B. Page 42-43). Henderson also did not

recall anytime when MCNH did not provide Broussard with corrected QHS information

when Broussard requested it. (Ex. B. Page 46.)

- Karen Henderson ("Henderson"), Broussard's billing manager supervisor, testified that

  Broussard performed Medicare billing and coinsurance billing, as well as Medicaid and

  copay billing functions for MCNH. (Exhibit J Henderson Deposition Page 12, Line 25;

  Page 13, Lines 1-6; Page 24, Lines 5-22; Page 32, Lines 1-14). **Henderson testified that**

  **Broussard made billing errors and its performance in following up was poor**. (Ex. J

  Page 49, Lines 3-25; Page 50, Lines 1-13; Page 55, Lines 1-11). She admitted the same

  in an email to Mr. Logan. (Exhibit K March 2015 email) **Henderson testified that**

  **Broussard attempted to collect on all accounts until the relationship was terminated**

  **but never turned over accounts to MCNH until then.** (Ex. J Page 50, Lines 1-13;

  Page 53, Lines 1-25; Page 57, Lines 1-10; Page 73, Lines 4-13). Henderson testified that

  she knew that because Broussard had made errors, she did not know, "whether we are

  going to keep them [MCNH as a client] or not." (Ex. J Page 86, Lines 17-25; Page 87,

  Lines 1-14). Henderson testified, "not that – we were doing it just to cover it up" but a

  revenue adjustment would "make it look better" than it was. (Ex. J Page 118, Lines 3-24).

  **Henderson testified Broussard made all the unauthorized revenue adjustments in**

**the period between April 2015 through December of 2015, it would not have been personnel at MCNH, and that the adjustments were more than likely made on claims that were not going to be paid.** (Ex. J Page 147, Lines 9-22; Page 148, Lines 5-24).

- Kimberly Bellitto, identified as both a fact witness and expert witness in the field of Medicare billing review, testified that entries in the American HealthTech system ("AHT") medical billing data supported her opinion that "some of the amounts that had now disappeared off of the agings and assumed paid, were actually revenue adjustments" and made "not according to industry standards." (Exhibit E Response to Interrogatory No. 2) (Exhibit L Kimberly Bellitto Deposition Page 33, Lines 5-25, Page 34, Lines 1-16; Page 36, Lines 18-25; Page 38, Lines 2-7; Page 80, Lines 12-25). Bellitto was assigned to MCNH when Mr. Logan reached out to a third party company, Pathways, in 2014 for help in figuring out why the Medicare revenue was not going in the right direction. (Ex. L Page 14-15). Bellitto was provided read only access to the AHT. (Ex. L, Page 15). She was asked by Mr. Logan to provide a top 25 report and her opinion was that there was an issue with timely filing and follow up by Broussard. (Ex. L, Pages 24-25). She saw plenty of evidence that due diligence was not being done and no proof that MCNH was not providing all the required information. (Ex. L, Page 25). After providing the top 25 report to Broussard, MCNH waited for Broussard to work the accounts. (Ex. L Page 28). After several months, Bellitto reviewed the aging and found certain months were now zero but there was no financial trail to show they were paid. (Ex. L Page 29-32). She viewed the transaction history and discovered these were due to revenue adjustments. (Ex. L Page 29-32). Bellitto explained different types of Revenue Adjustments, when

they should be used, and why those that she found were not in accord with health industry standard. (Ex. L Page 33, Page 36-39). She testified these types of adjustments require administrator authorization to write-off. (Ex. L Page 39). Bellitto testified that at the meeting with Broussard, Beth Broussard was "stone silent" when confronted about a specific outstanding claim Ms. Broussard claimed was paid but was in fact simply written off, as if it "disappeared." (Ex. L Page 88-93). The non-standard revenue adjustment made it appear as if the accounts receivables never existed. (Ex. L. Page 101). Bellitto testified that Broussard's excuse was that they were not provided information from MCNH for QHS "they just sat and waited, rather than being proactive" and responded it was MCNH's responsibility. (Ex. L. Page 102-103). Bellitto's opinion was Broussard made improper revenue adjustments, failed to bill, and failed to follow-up. (Ex. L. Page 104-105, 112-113, 114). In April of 2016, Bellitto provided notes on her reports to Ms. Snyder for her billing to see if any could be collected. (Ex. L. 117-18).

- Latisha Gentry, a biller employed by Broussard assigned at one time testified that it was common practice in the course of dealings with their clients to bill for clients well past 90 days. (Exhibit M Gentry Deposition Page 26, Lines 8-24).

- Broussard's expert Christopher J. Murphy ("Murphy") testified that client approval would be needed or at least a review after the fact if a biller was writing off something as uncollectible. (Exhibit N Page 69, Lines 23-25; Page 70, Lines 1-3).

- Murphy testified that "turned over" means "I take those claims out of my system as the billing services provider and give those claims and the detailed related to that back to the client." (Exhibit N Page 76, Lines 16-23). Generally, to turn over, according to Murphy, means that the billing provider would let the client know that they are no longer handling

the account and we are handing it back over to you.  (Ex. N Page 77, Lines 18-22).  It is undisputed that until the end of the relationship between MCNH and Broussard there was no such communications. **Again, Henderson testified that Broussard attempted to collect on all accounts until the relationship was terminated but never turned over accounts to MCNH until then.**   (Ex. J Page 50, Lines 1-13; Page 53, Lines 1-25; Page 57, Lines 1-10; Page 73, Lines 4-13).

- Broussard's expert Ralph A. Litolff, Jr. did not dispute that there are damages that have been suffered by MCNH.  He testified, "[t]hat would be outside the scope of what I'm doing and that should be up to the trier of fact to determine whether or not it's properly established if damages were sustained" and for a trier of fact to determine whether damages are "reasonably certain or not." (Exhibit O Page 87, Lines 5-18, Page 131-132; Page 64, Lines 11-25).

- Litolff testified that if it was determined Broussard was to perform and collect co-insurance, his opinion could change.  (Ex. O at Page 64, Lines 1-4, Lines 11-25; Page 65, Lines 1-5).

   F.  CMS hold had little or no significance

  In the last section of Broussard's statement of facts, Broussard makes much ado about a Medicare hold by the Centers for Medicare and Medicaid Services ("CMS") because MCNH was not in compliance with Medicare's federal participation requirements.  According to a letter from CMS, the hold never went into effect; therefore, Broussard's arguments here hold no weight whatsoever. (Ex. A).  The hold had to do with a survey of Resident Trust Funds and MCNH took immediate corrective actions. (Ex. B., PGS 75-77).

## ARGUMENT

### I.   THE "MINUTES RULE" WAS NOT INTENDED TO PROTECT A PRIVATE ENTITY SUED FOR NEGLIENCE OR BREACH OF CONTRACT.

MCNH can find no authority that establishes the minutes rule can be used affirmatively by a private entity to avoid its contractual obligations and/or to avoid claims of negligence and/or professional malpractice against a private party who does business with a political subdivision.   Broussard relies heavily on a recent Fifth Circuit opinion, Lefoldt v. Horne, L.L.P., 853 F.3d 804 (5th Cir. 2017) and Memorandum Opinion by United States District Judge Keith Starrett in the Southern District of Mississippi, Western Division, Lefoldt v. Rentfro, Civ. Action No. 5:15-cv-96 (S.D. Miss. Dec. 1, 2017) (appealed on August 20, 2018 by way of Final Judgment and incorrectly cited by Broussard as "5:15-cv-97"; See USCA Case Number 18-60581). See Footnote 9 at Page 10 of Broussard's Memorandum (Dkt. 103).   However, Broussard's reliance on those opinions is misplaced.   Careful review of the background facts is required to fully understand the Fifth Circuit's opinion and Judge Starrett's December 1, 2017 opinion.

Lefoldt, acting as bankruptcy trustee on behalf of a community hospital, filed a Complaint against Horne, L.L.P. ("Horne") alleging professional malpractice in performing auditing work for the community hospital. (See Memorandum Opinion and Order; 5:15-cv-96, Dkt. 68) (S.D. April 11, 2016).   In response, Horne sought to compel arbitration but Lefoldt argued the arbitration provisions were not binding "because their terms were not spread upon the minutes."   (See Memorandum Opinion and Order; 5:15-cv-96, Dkt. 68) (S.D. April 11, 2016).   Therefore, Lefoldt, standing in the shoes of a political subdivision, affirmatively raised the minutes rule.   Judge Starrett found that under the minutes rule, the arbitration provision could not be enforced.   (See

11

Memorandum Opinion and Order; 5:15-cv-96, Dkt. 68) (S.D. April 11, 2016).  Under those facts, Horne appealed to the Fifth Circuit.  The Fifth Circuit handed down an opinion discussing at length several Mississippi cases concerning the minutes rule and its effect on the contractual relationship between the parties, primarily focusing on the enforceability of the arbitration provision.  Lefoldt v. Horne, L.L.P., 853 F.3d 804 (5th Cir. 2017).

The minutes rule only came into play because Lefoldt affirmatively pled and successfully argued application of the minutes rule to contest any agreement to arbitrate between those parties.  The factual background and course of proceedings of MCNH's case is distinguished simply because MCNH has never invoked the minutes rule. Lefoldt, on behalf of a political subdivision, did affirmatively invoke the minutes rule. The Fifth Circuit opinion in Lefoldt does not stand for the proposition that a private entity can affirmatively assert the minutes rule to avoid contractual liability, claims of negligence, and/or claims of professional malpractice, as Broussard attempts to do here.

As recognized by the Fifth Circuit, the policy "reasoning [in Mississippi] behind requiring contracts to be spread upon the minutes is that the minutes rule '**protect[s] the board from being bound** by the unauthorized acts of individual members of the board or an agent thereof.'" Lefoldt v. Horne, L.L.P., 853 F.3d 804 (5th Cir. 2017) citing Wellness, Inc. v. Pearl River County Hospital, 178 So. 3d 1287, 1290-91 (Miss. 2015) (emphasis supplied).  Moreover, board members are "elected officials charged with the **protection of the public's funds**." Id. (emphasis supplied).  In Butler v. Board of Sup'rs for Hinds County, 659 So.2d 578 (Miss. 1995), the Mississippi Supreme Court, opining on the minutes rule, stated "the policy of protecting the public's funds for use by and for the

public is paramount to other individual rights which may also be involved." Broussard is not even a citizen of Mississippi, was not formed in Mississippi and is not qualified to do business in Mississippi.  The United States Supreme Court has opined that non-citizens of a state do not have rights to access that state's public records.  McBurney v. Young, 133 S.Ct. 1709, 569 U.S. 221, 185 L.Ed.2d 758 (2013). Broussard is not a member of the Mississippi public.  The minutes rule was never intended to protect private entities, much less non-citizens.

The minutes rule is simply not an affirmative defense available to be raised by a private entity seeking avoidance of its contractual obligations or seeking to avoid claims of malpractice. The rule was never intended to protect a private entity when it causes harm to a political subdivision.  Mississippi law requires "**private parties to ensure that their contracts are properly recorded in board minutes**." Lefoldt v. Horne, L.L.P., 853 F.3d 804 (5th Cir. 2017) (emphasis supplied).  Broussard erroneously states in its brief that the law "requires a Board of Trustees to ensure a contract is properly recorded in its minutes for the contract to exists."  Broussard completely misunderstands and misstates the minutes rules.  Because it was Broussard's duty, not the board's duty, to ensure the contract terms were spread on the minutes, it is only logical that the minutes rule is not a defense that may be raised by a private party to avoid a contract.  Otherwise, the private party could simply always purposefully fail in its duty to ensure the terms are spread on the minutes only to later use the minutes rule defensively in anticipation that it could later be sued for breaching contractual duties or as a means to provide future protection from its own negligence acts and/or malpractice in performing its duties.

**II. IF THE "MINUTES RULE" IS AN AFFIRMATIVE DEFENSE AVAILABLE TO BROUSSARD, IT HAS BEEN WAIVED BASED ON BROUSSARD'S FAILURE TO PLEAD THE DEFENSE AND BASED ON BROUSSARD'S ADMISSIONS IN ITS ANSWER AND AFFIRMATIVE DEFENSES**

In Paragraphs 4, 5 and 9 of its Answer & Affirmative Defenses Broussard "admit[ed] they entered into a contractual relationship with Plaintiff," "admit[ed] they performed services pursuant to their contractual relationship with" MCNH and admitted "that they terminated their contractual relationship with Plaintiff in January of 2016" (Dkt. 2). Until now, Broussard admitted at all times in its pleadings that it entered into a contractual relationship with MCNH that was not terminated until January of 2016. Now that the discovery period is over, Broussard for the first time has reversed course attempting to raise the minutes rule for the purposes of denying that a contractual relationship existed. Under the circumstances, Broussard has waived the minutes rule as an affirmative defense.

Broussard did not request board minutes of MCNH in any of its written discovery requests. At most, Broussard requested that MCNH identify each document in its possession "related in any way to the claims or defenses" and requested MCNH to produce "agreements and/or client contracts" between Broussard and MCNH. <u>See</u> Interrogatory No. 5 and Request for Production No. 4 of Plaintiff's First set of Discovery to MCNH (Exhibit P). Because the minutes rule was not raised as a defense, MCNH had no reason to conduct discovery or to produce any discovery addressing the newly raised minutes rule defense. The minutes rule was not a relevant or known issue, especially in light of Broussard's admissions. (Dkt. 2). Broussard cites to Page 34 of the deposition transcript of Paul Tankersley wherein counsel for MCNH verified that every minute

related to Broussard was provided but verifies by signature on this pleading that he was referring to the body of the written minutes, not to financial statements attached to minutes. However, in the context of an unknown defense based on the minutes rule, MCNH had no reason to believe at that time that monthly payment amounts approved by the Board could also have relevance. The fact that Broussard invoiced MCNH and was paid regularly by MCNH was not in dispute. There are hundreds of pages of invoices and Board approved checks evidencing the contractual relationship. (Ex. A).

Rule 8(c) of the Federal Rules of Civil Procedure requires that a party, in responding to a pleading, "must affirmatively state **any avoidance or affirmative defense**, including" a "statute of frauds" defense. Broussard is clearly attempting to use the minutes rule as an "avoidance" defense. The Fifth circuit in Lefoldt compared the minutes rule to a "statute of frauds" defense, finding that "the minutes rule is partially in the nature of a statute of frauds or a prohibition of reliance on parol evidence. Lefoldt v. Horne, L.L.P., 853 F.3d 804 (5th Cir. 2017). If the defense is not affirmatively raised, it is deemed to be waived.

"When the defendant has waived his affirmative defense by failing to allege it in his answer, or have it included in a pre-trial order … that supersedes the pleadings, he cannot revive the defense in a memorandum in support of a motion for summary judgment." Polles v. Federal National Insurance Corporation, 749 F.Supp. 136 (N.D.Miss. 1990) citing, Funding Systems Leasing Corp. v. Pugh, 530 F.2d 91, 96 (5th Cir. 1976). If the defense "is raised in a manner that that does not result in unfair surprise … technical failure to comply with Rule 8(c) is not fatal." Id. Citing Allied Chemical Corp. v. Mackay, 695 F.2d 854, 855-56 (5th Cir. 1983). In this case, there is unfair

prejudice.  Because the minutes rule was not raised as a defense, MCNH had no reason to conduct discovery or to produce any discovery on the newly raised minutes rule defense. Discovery as to the minutes rule simply had no relevance, especially based on Broussard's admissions.

In <u>Kevin Jordan v. Ensco Offshore Company</u>, the United States District Court for the Eastern District of Louisiana granted a motion to strike an affirmative defense of fraud raised for the first time in a pre-trial order because the defense was waived.  The court found it unjust and prejudicial, given that the defense was raised for the first time in a pre-trial order about one month before trial.  Given that Broussard waited to raise the defense until the day of the dispositive motion deadline, after discovery has been completed, coupled with its previous admissions as to the contractual relationship, MCNH has been unfairly prejudiced in now having to respond to the waived defense, especially without the benefit of knowledge of the defense during the course of discovery.  MCNH requests that the Court find the defense waived and strike the defense in any future trial proceeding.

### III.  THE CONTRACT WAS VALID FOR EACH AND EVERY YEAR OF THE CONTRACTUAL RELATIONSHIP.

Broussard submits it is undisputed that the Agreement expired on May 1, 2011 because there was no "review" of the 2010 Agreement.  First, there is nothing in the Agreement which indicates which party is to conduct any review and there is nothing in the Agreement indicating what a review involves.  Moreover, at Paragraph VI titled "Termination" the Agreement provides:

> This Agreement and the employment of The Broussard Group by Administrator **shall only be terminated upon the following occurrences**:

(a)    Expiration of the term in accordance with the provisions hereof;

(b)    Permanent cessation of all business operations at the nursing facility, upon not less than sixty (60) days written notice;

(c)    Permanent cessation of business by The Broussard Group, upon not less than sixty (60) days written notice;

(d)    Failure to correct a breach of any obligation contained in this Agreement within thirty (30) days following written notification of breach by the non-defaulting party at the election of the non-defaulting party;

(e)    The filing of Proceedings by or against either party to this Agreement under the provisions of the Bankruptcy Laws of the United States of America or the State of Louisiana

(f)    Delivery by either party of not less than sixty (60) days written notice of an election to terminate the Agreement on a specified date.

If the Agreement "shall only" be terminated for one of those occurrences in subparts a) through f) then by express terms, it cannot be terminated for any alleged failure to perform a review.

It is not disputed that Broussard prepared the Agreement. (Ex. A). Any provisions that conflict with another provision are to be construed against Broussard in favor of MCNH.

A contract is ambiguous if it contains conflicting clauses when the contract is read as a whole.  This contract is capable of more than one reasonable interpretation as to when and how the contract can be terminated.  This contract fails to provide a clear direction as to which termination clause applies, without consideration of extrinsic evidence. Once a contract is found to be ambiguous, **resolution of any uncertainties will be against the drafter of the contract**.

Dalton v. Cellular South, Inc., 20 So.3d 1227, 1232 (Miss. 2009) (emphasis supplied).

The Agreement expressly provided it would continue from year to year.  The Board specifically approved payments made to Broussard continuously over the course of several years. (Ex. A).  Broussard may not now claim the Agreement was terminated for any alleged failure to "review."  Broussard, by its actions, is equitably estopped from

now denying the existence of a contractual relationship until January of 2016 when the

relationship was terminated. Where there is sufficient evidence of Board approval on the

minutes, equitable estoppel applies to prevent a party from asserting a right inconsistent

with a position it has previously taken.

> The court in Urban Developers acknowledged that in <u>Community
> Extended Care Centers v. Board of Supervisors for Humphreys County,</u>
> 756 So.2d 798, 804 (Miss.Ct.App.1999), the Mississippi Court of
> Appeals, after first concluding that the minutes requirement was satisfied
> where the minutes reflected the Board's authorization for the Board
> president to enter a specific lease, held alternatively that the supervisors
> were equitably estopped by their actions (which included the original
> resolution on the minutes and two resolutions to amend the lease, which
> were also entered in the minutes) from arguing that the "technical
> omission" of not having the lease contract itself "spread across the minute
> book" should invalidate the lease contract. 468 F.3d at 301-02. The court
> in <u>Community Extended Care Centers</u> had noted that although "no
> estoppel may be enforced 'against the state or its counties **where the acts
> of their officers were unauthorized**,' ... the **resolution entered on the
> Board minutes shows the supervisors unanimously approved** the lease
> contract with CECC and authorized the Board president to sign the lease
> contract on behalf of the Board." 756 So.2d at 804.

<u>Pike County vs. Indeck Magnolia, LLC</u>, 866 F. Supp.2d 589 (S.D.Miss. 2012) (emphasis

supplied).   Additionally, the court in <u>Community Extended Care Centers v. Board of

Supervisors for Humphreys County</u>, 756 So.2d 798, 804 (Miss.Ct.App. 1999) found

estoppel applied where the "the Board affirmatively acknowledged the existence of the

January 6, 1983 lease contract by accepting CECC's monthly payments of rent," among

other indications of that Board's intent.

> "[E]stoppel forbids one from both gaining a benefit under a
> contract and then avoiding the obligations of that same contract."
> <u>Bailey v. Estate of Kemp</u>, 955 So.2d 777, 782 (¶ 21) (Miss. 2007).
> Equitable estoppel applies where the following factual elements
> are proven: " (1) belief and reliance on some representation; (2)
> change of position, as a result thereof; (3) detriment or prejudice
> caused by the change of position." <u>Cmty. Extended Care Ctrs. Inc.
> v. Bd. of Sup'rs for Humphreys Cnty.</u>, 756 So.2d 798, 804 (¶ 24)

(Miss. Ct.App. 1999). Quasi-estoppel, a similar doctrine, " 'precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken,' and 'applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.'" Bailey, 955 So.2d at 782 (¶ 21) (quoting Bott v. J.F. Shea Co., 299 F.3d 508, 512 (5th Cir. 2002)).

Home Base Litter Control, LLC v. Claiborne County, Mississippi, 183 So.3d 94, 102 (Miss.App. 2015). Since it undisputed the Board approved the contractual relationship, Broussard is estopped from arguing, under the circumstances, that there was no contractual relationship. MCNH consistently paid Broussard for Medicare billing services throughout the relationship and Broussard allegedly attempted to render those services. (Ex. A).

Broussard is also bound by its admissions at Paragraphs 4, 5 and 9 of its Answer & Affirmative Defenses. Based on these facts, Broussard is not entitled to a summary judgment on the issue of the continuing validity of the Agreement for subsequent years when the contractual relationship continued until the contract was terminated in January 2016.

## IV. EVEN IF THIS COURT WERE TO DETERMINE THERE WAS NO VALID CONTRACT FORMED BETWEEN THE PARTIES, THE MINUTES RULE DOES NOT PROTECT BROUSSARD FROM CLAIMS OF NEGLIGENCE AND/OR PROFESSIONAL MALPRACTICE

According to Broussard, the "minutes rule" disposes of MCNH's malpractice claims because MCNH cannot show a professional relationship existed between it and Broussard. First, Broussard is bound by its admissions and is precluded from now reversing course to argue there was not a professional relationship when it has at all times admitted the professional relationship existed. Second, the Board minutes clearly support

that MCNH manifested its intent to enter into a contractual and/or professional relationship with Broussard. Here again, Broussard relies heavily on a purported requirement for a "mandatory annual review" in its attempt to allege that the relationship ended because the Board did not manifest an intent for the relationship to continue after the alleged expiration of the November 2010 Agreement on May 1, 2011. As set forth above, the Agreement itself provided that the only way to termination the relationship was through one of those occurrences in subparts a) through f) of Section IV of the Agreement. Any alleged failure to perform a review was not included in the list of occurrences. Moreover, the Board's intent is clearly shown by its regular payments to Broussard approved by the Board each year of the contractual relationship.

Broussard again relies on Judge Starrett's December 1, 2017 opinion in claiming that there is no professional relationship where a community hospital board fails to manifest an intent to enter into a professional relationship. The issue that Judge Starrett took with Lefoldt was that Lefoldt failed to "provide evidence that it manifested its intent to the defendant that it provide services for the plaintiff." Lefoldt v. Rentfro, Civ. Action No. 5:15-cv-96 (S.D. Miss. Dec. 1, 2017) (appealed through a Final Judgment on August 20, 2018); Lefoldt v. Rentfro, Civ. Action No. 5:15-cv-96 (S.D. Miss. March 14, 2018). On reconsideration, Lefoldt sought to submit what it considered new evidence because the executive session minutes for subsequent years reflected that the community hospital entered into a professional relationship with Horne. Lefoldt v. Rentfro, Civ. Action No. 5:15-cv-96 (S.D. Miss. March 14, 2018). Judge Starrett was critical of Lefoldt for waiting to submit the minutes until reconsideration, finding that Lefoldt first raised the minutes rule and argued there was no contract for over two years prior in order to defeat

the arbitration provision. <u>Lefoldt v. Rentfro</u>, Civ. Action No. 5:15-cv-96 (S.D. Miss. March 14, 2018, appealed August 20, 2018 through a final judgment). Lefoldt sought to submit minutes to prove the professional relationship that the court had not previously seen and the parties had not previously cited. Here, Broussard is the one who failed to raise the minutes issue until now and at all times admitted in pleadings that it was in a contractual relationship with MNCH until terminated in January of 2016.

Judge Starrett's December 1, 2017 Memorandum Opinion and Order found that the "Board's minutes do not reflect that [the community hospital] manifested its intent that Horne provide accounting services for subsequent years. Therefore, the question is not whether or not there is a valid contract (the Agreement was in fact valid), the question is whether the Board's minutes manifested an intent that Horne provide services. In this case, MCNH clearly manifested an intent to have a professional relationship with Broussard. That intent is proved by the Agreement that was spread on the record and continued from year to year, as well as by the subsequent board approved payments to Broussard that continued every month and every year until the relationship terminated in January of 2016.

In <u>Edmonds v. Williamson</u>, 13 So. 3d 1283, 1290 (Miss. 2009) and <u>Gibson v. Williams, Williams & Montgomery</u>, P.A., 186 So.3rd 836, 849 (Miss. 2016), those plaintiffs established a lawyer-client relationship with the defendant attorney, **despite never having signed representation agreements**. This Court has acknowledged that a professional relationship may arise under different circumstances therefore the inquiry is "fact-specific." <u>Crews & Assocs., Inc. v. City of Port Gibson, Miss.</u>, No. 14-37 (S.D. Miss. Nov. 13, 2014). Based on Broussard's admissions in its Answer, it is not genuinely

disputed that Broussard and MCNH were in a professional relationship at all times until the Agreement was terminated in January of 2016. It is the professional's undertaking to do work, and not a written contract, that gives rise to a professional relationship. Hutchinson v. Smith, 417 So. 3d 926, 927-28 (Miss. 1982).

Plaintiff's claims against Broussard are not necessarily limited to professional malpractice. Broussard Healthcare Consulting, LLC, which provided the billing services, is not a CPA firm. (Exhibit Q Broussard 30(b)(6) Deposition). The other named defendant is merely the payroll arm of Broussard Healthcare Consulting, LLC. (Ex. Q). Broussard's business is to provide billing and services. It owed a duty to adequately perform those services but failed to do so causing significant damage to MCNH.

### V. MCNH HAS PRODUCED SUBSTANTIAL EVIDENCE THAT MCNH SUFFERED DIRECT DAMAGES AS A RESULT OF BROUSSARD'S BREACH OF ITS CONTRACTUAL OBLIGATION AND NEGLIENCE IN PERFORMING BILLING SERVICES

As a result of Broussard's breach of its contractual obligations and negligence in performing billing services for MCNH, MCNH suffered direct damages calculated by Dawn Snyder to be $904,213.51. (Ex. C Snyder Expert Report) (Ex. D amended Attachment 7.1) (Ex. F Pages 138-142) (Ex. C original Attachment 7.1). Attachment 7.1 to Snyder's report was amended and provided to Broussard's counsel at Snyder's deposition. That is addressed in more detail in MCNH's Memorandum in Opposition to Broussard's Motion to Exclude Snyder's Testimony (Dkt. 115), all of which is incorporated by reference as if completely restated herein.

Henderson's testimony, coupled with Snyder's report and testimony, among a plethora of other evidence submitted, provides ample support that MCNH suffered damages as a result of Broussard's failings. Henderson admitted numerous facts that support MCNH's claims. As set out in the bullet facts above, Broussard performed Medicare billing and coinsurance billing, as well as Medicaid and copay billing functions

for MCNH. Broussard made billing errors and its performance in following up was poor. Henderson testified Broussard never turned over accounts to MCNH until the relationship ended. She knew that because of the errors MCNH would likely terminate the relationship.  In the face of admissions from its own billing supervisor, it is absurd for Broussard to claim MCNH has produced no evidence.

Additional evidence in the form of testimony from Daniel Logan, Kimberly Bellitto (both in her capacity as a fact witness and expert witness), and even Broussard's own experts, supports that the evidence is sufficient.

Ed LeBreton ("LeBreton") and Snyder's reports, not only served as peer validation of Kimberly Bellitto's report, but serve to demonstrate damages to a reasonable degree of certainty. They began with her sample and diligently confirmed her findings. Both LeBreton and Snyder reviewed the other's expert report so to say their reports were not peer reviewed is false.  (Exhibit C Snyder report at Page 3).

As a matter of law, MCNH has proven to a reasonable degree of certainty the damages to which MCNH is entitled.  Moreover, Broussard simply cannot refute that it is liable for the full amount of damages set out in Snyder's report.

> In Mississippi, a party may recover for loss of future profits "as long as such profits are proved with reasonable certainty, not based on speculation or conjecture." Lovett v. E.L. Garner, Inc., 511 So.2d 1346, 1353 (Miss. 1987). "This Court has stated that 'there are no guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits.' " Lane v. Lampkin, 175 So.3d 1222, 1228 (Miss. 2015) (quoting Lovett, 511 So.2d at 1353). Further, "the degree of proof required usually depends on the particular facts of the case." Lovett, 511 So.2d at 1353. This Court has been clear that:
>
> Liability cannot be escaped on the grounds that the proof as to the amount of damages, if any, is too uncertain to justify the lower court's award.  It is well recognized that "Mississippi is equally firm in its determination that a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused." R & S Dev., Inc. v. Wilson, 534 So.2d 1008, 1012 (Miss. 1988) (quoting Johnston v. Safeco Ins. Co. of Am., 727 F.2d 548, 551 (5th Cir. 1984)).

Lane v. Lampkin, 234 So.3d 338 (Miss. 2017). Moreover, this Court has stated:

The Mississippi Court of Appeals case <u>Benchmark Health Care Center, Inc. v. Cain</u> provides a succinct overview of the recoverability of lost profits in Mississippi:

In Mississippi, a party may recover for loss of future profits in a breach of contract action so long as such profits are proved to a reasonable certainty and not based on mere speculation or conjecture. The rule that uncertain damages cannot be recovered applies only to the nature, not the extent, of the damages. If the nature of the damages is certain but the extent is uncertain, recovery is not prevented. In <u>Cain v. Mid-South Pump Co.</u>, the Mississippi Supreme Court addressed this rule stating: [W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence-with such certainty as the nature of the particular case may permit-lay a foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss. The supreme court further provided that when a plaintiff has suffered monetary damage and has produced the best evidence available to him, he should not be denied recovery simply because the amount of damages cannot be ascertained with the same precision as an ordinary claim for damages. 912 So. 2d 175 (Miss.App. Ct. 2005) (citations omitted)

<u>Natchez Regional Medical Center, Quorom Health Resources, LLC</u>, 879 F.Supp.2d 556, 578 (S.D.Miss. 2012).  Furthermore, "no Mississippi case prescribes (or proscribes) a particular method for determining what damages are reasonably certain." <u>Natchez Regional Medical Center, Quorom Health Resources, LLC</u>, 879 F.Supp.2d 556, 579 (S.D.Miss. 2012).

Under these standards of proof, MCNH has shown more than reasonable certainty of the direct damages suffered by MCNH.  The total amount of damages calculated by Dawn Snyder found to be collectable but uncollected by Broussard is $904,213.51.  (Ex. C) (Exhibit D amended Attachment 7.1 to Snyder Report) (Ex. F Pages 138-142).

Broussard attacks Snyder's Methodology by arguing the report is only a sampling. Broussard erroneously asserts that the sampling "only" covers approximately "$197,000.00" of the alleged damages included in the sample.    But, Broussard is not painting the entire picture. The sampling actually included examination of not just the amount of $197,571.48 for Medicare, but also $95,356.00 for coinsurance which could not be collected due to the failure to collect the primary coverage, Medicare, and Revenue Adjustments of $122,171.90, improperly made by Broussard, all totaling $415,099.38. Snyder testified that she reviewed all of the underlying information in detail in these categories. That would mean that the sampling is over 45% of the total, direct damages. [See this issue covered in more detail in MCNH's *Memorandum in Support of its Response in Opposition to Motion to Exclude Opinions of Dawn K. Snyder* (Dkt. 115) which in the interest of brevity is incorporated herein by reference.

The law in Mississippi is clear that "no Mississippi case prescribes (or proscribes) a particular method for determining what damages are reasonably certain." Natchez Regional Medical Center, Quorom Health Resources, LLC, 879 F.Supp.2d 556, 578-79 (S.D.Miss. 2012).  However, the damage assessment calculation by Ms. Snyder is more than just reasonable, it is as close to being a mathematical certainty as possible, especially in the field of Medicare billing. Snyder looked at all in detail for sample and reviewed all claims when preparing Amended 7.1.   The amount of damages went down when amended, but it reinforced her opinions. *See* MCNH's *Memorandum in Support of its Response in Opposition to Motion to Exclude Opinions of Dawn K. Snyder* (Dkt. 115) which in the interest of brevity is incorporated herein by reference.

## VI.  CONTRARY TO BROUSSARD'S ARGUMENTS THAT THERE IS NO ADMISSABLE EVIDENCE TO SUPPORT DAMAGES, MCNH AND ITS EXPERTS HAVE PRODUCED ADMISSIBLE EVIDENCE TO SUPPORT ITS CLAIMS

Broussard claims that MCNH has not produced admissible summary judgment evidence because it did not produce certain documents until Snyder's deposition, two days before the discovery deadline ended and produced additional the next week. These occurrences were substantial justified and certainly not harmful. Without repeating the arguments here as to why Snyder's, Lebretton's and Bellitto's reports and testimony are admissible in connection with any alleged production or other issues, MCNH incorporates by reference MCNH's *Memoranda in Support of its Response in Opposition to Motion to Exclude Opinions of Dawn K. Snyder,* (Dkt. 115) which in the interest of brevity are incorporated herein by reference.

## VII. THERE IS EVIDENCE OF FRAUD

Not only has MCNH submitted more than sufficient evidence of Broussard's negligence, professional malpractice, breach of contractual obligations and breach of implied covenant of good faith and fair dealing, MCNH has also submitted sufficient evidence of fraud that a jury could reasonably find that Broussard's use of Revenue Adjustment to "cover up" or make "disappear" uncollected claim amounts. MCNH's 30(B)(6) designee, Daniel Logan, testified that he saw the accounts receivables going down so he was led to believe, following the audit, that the accounts were being collected.   (Exhibit I MCNH 30(B)(6) Deposition Page 16, Lines 9-19). The Reports of MCNH's experts only reinforce Broussard's fraudulent actions in making increased Revenue Adjustments from "March 2015 through September 2015) without authorization and inconsistent with industry standard, which "made it appear that those account had either never been owed, had been paid, or had never been charged.".  (Exhibit C Snyder

Report at Page 4; Exhibit S Bellitto Report at Page 6-7). Bellitto testified that at the meeting with Broussard, Beth Broussard was "stone silent" when confronted about a specific outstanding claim Ms. Broussard claimed was paid but was in fact simply written off, as if it "disappeared." (Ex. L Page 88-93). The non-standard revenue adjustment made during 2015 made it appear as if the accounts receivables never existed. (Ex. L. Page 101).

The evidence is very clear and very convincing that Broussard's attempted cover up: 1) Broussard by its cover-up represented that accounts were collected when they were not: 2) the cover-up was false because the accounts were not collected; 3) the fraud was material because it was Broussard's responsibility to collect accounts, not to make them appear to be collected; 4) Broussard was aware that the adjustments would make it seem better than it was; 5) the intent made MCNH believe that the accounts were collected when they were not; 6) MCNH had no knowledge of the cover-up until a third party informed it of the occurrences; 7) MCNH relied on the misleading actions of Broussard; and 8) MCNH's reliance caused consequent and proximate injury for all those amounts that MCNH was unable to collect as well as damages for having to investigate and uncover the fraud. For all these reasons, MCNH has submitted sufficient evidence to support its claims for fraud, punitive damages, attorney's fees and a jury charge for spoliation of evidence. In re Mississippi Medicaid Pharm., 850 So.2d 78, 84 (Miss. 2003).

### VIII. SPOLIATION AND OTHER CLAIMS

There is no cause of action for damages for spoliation in Mississippi, and MCNH is merely requesting a spoliation instruction to the jury, which is appropriate to the unauthorized Revenue Adjustments. MCNH contends that it has presented ample evidence to have a jury consider whether the acts of Broussard making the unauthorized

Revenue Adjustments. As Broussard points there are five elements to prove spoliation:

> (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

Barnett v. Deere & Co., 2016 WL 4544052 at *1-2 (S.D. Miss. Aug. 31, 2016).

First, Broussard did have control over the information as Revenue Adjustments of the type complained about here were not anything that MCNH wanted or knew how to do an Broussard had access to the data. Second, Broussard had no authority to make Revenue Adjustments of these types. Third, a jury could infer or determine Broussard had a culpable state of mind, specifically since the Revenue Adjustments in question were done after poor billing was brought to the attention of Broussard and Broussard was to be working the accout, but instead in some instances they made the balances "disappear" with no authority from or notice to MCNH. Finally, a reasonable trier of fact could very much find that the Adjustments, and the intent behind them, support MCNH's claims of improper actions by Broussard. At a minimum, this question should be saved until the charge conference at trial.

As to the remaining claims for temporary restraining order and accounting MCNH did not pursue these claims and chose to focus on the monetary damages. MCNH will enter into a Joint Dismissal of them if the Court so desires.

**IX. CMS ISSUES**

Broussard raises issues about Centers for Medicare & Medicaid Services ("CMS") data and questions, but those concerns are addressed by Snyder's report and a link to Centers for "Medicare & Medicaid Services: Long-Term Care

Facility Resident Assessment Instrument User's Manual Version 3.0 - CHAPTER 6: MEDICARE SKILLED NURSING FACILITY PROSPECTIVE PAYMENT SYSTEM (SNF PPS) https://www.aanac.org/docs/mds-3.0-rai-usersmanual/11139_mds_3 0_chapter_6_v1-12r.pdf?sfvrsn=10." That link was identified in Snyder's report at page 3. References and instructions for qualifying hospital stays ("QHS") can be found at pgs. 13-14 in the User's Manual found at the link. This is the Users Manual for billers, and they are expected to follow the myriad of requirements Snyder also addressed the issue with QHS, and conferring with CMS would not have fixed the problem. Where there were QHS issues they were due to the dates not being reported on subsequent claims paid, and she addressed that as follows in the first bullet point on page 5:

> "The first claim reviewed was for October 2010 for Medical Record no. 716. The Defendants indicated that the qualifying hospital stay (QHS) was not provided. Attachment 1 will reflect that Medicare paid for August 2010 and September 2010 dates of service on September 17, 2010 and August 26, 2011, respectively. August 2010 and September 2010 claims would not have been paid if the correct qualifying stay was not provided on those claims. The October 2010 claim should have been corrected and resubmitted for payment after the September 2010 claim was processed by the Medicare Fiscal Intermediary. **It is standard industry practice for billing firms to research the reason for a claim being denied, and comparing the denied claim with an immediately preceding claim which has been approved and processed by the payor; the Defendants failed in this case to follow that standard industry practice.**" Ex. D. (emphasis supplied)

WHEREFORE, PREMISES CONSIDERED, Madison County Nursing Home requests that this Court deny The Broussard Group, L.L.C. and Broussard Healthcare Consulting, L.L.C. previously known as Broussard & Company Health Care Consultants,

L.L.C. motion for summary judgment and grant such other relief as is necessary under the circumstances.

DATED:  September 7, 2018.

**MADISON COUNTY NURSING HOME**

By:_____/s/ *Michael S. MacInnis*_____
        Michael S. MacInnis
        Its Attorney

Prepared by:
Michael S. MacInnis, MSB # 8376
Jon J. Mims, MSB # 100341
Rawlings & MacInnis, P.A.
Post Office Box 1789
Madison, MS 39130-1789
Telephone: (601) 898-1180
Facsimile: (601) 969-1041

## CERTIFICATE OF SERVICE

I, Michael S. MacInnis, do hereby certify that I have this day electronically filed the foregoing with the Court using the ECF system which sent notice of the filing to attorneys of record, including:

Matthew T. Biggers
mbiggers@deutschkerrigan.com
Attorney for Defendants

Judy L. Burnthorn
jburnthorn@deutschkerrigan.com
Attorney for Defendants

Lawrence M. Quinlivan
mquinlivan@deutschkerrigan.com
Attorney for Defendants

This the 7th day of August, 2018.

*/s/ Michael S. MacInnis* _____
Michael S. MacInnis